IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
Greenbelt Division

| | | |
|---|---|---|
| In re: | * | |
| **BOTANICAL DECORATORS, INC.** | * | Case No. 22-16223 MCR (Chapter 7) |
| Debtor. | * | |

APPLICATION FOR COMPENSATION AND
REIMBURSEMENT OF EXPENSES OF OFFIT KURMAN, P.A. AS
SPECIAL COUNSEL TO LAURA J. MARGULIES, CHAPTER 7 TRUSTEE

This Application of Offit Kurman, P.A. (the "Applicant") is for Compensation and Reimbursement of Expenses as Special Counsel to Laura J. Margulies, the Chapter 7 Trustee for Botanical Decorators, Inc. (the "Application") for the period of December 1, 2022, through the date of filing this Application ("Fee Period"). In support of the Application, the Applicant states as follows:

**Background**

1.      On November 7, 2022, Botanical Decorators, Inc. (the "Debtor"), filed a Petition under Chapter 7 of the Bankruptcy Code in Case No. 22-16223 MCR ("Bankruptcy Estate" or "Bankruptcy Case" or "Bankruptcy Schedules"). Laura J. Margulies was the duly appointed Chapter 7 Trustee and continues to serve as the Chapter 7 Trustee of the Debtor (the "Trustee").

2.      On November 21, 2022, the Trustee filed an Application to Employ Applicant as Special Counsel to the Trustee to assist in recovering assets of the Debtor for the benefit of creditors of the Bankruptcy Estate. [DE 16].

3.      On December 12, 2022, the Court entered an Order appointing Applicant as Special Counsel to the Trustee. [DE 19].

1

**Application**

4.      Applicant submits this Application for its efforts in representing the Trustee.

5.      The services for which compensation is sought and the expenses for which reimbursement is sought herein have not been the subject of a prior fee application.   All professional services for which allowance of compensation is requested were performed by Applicant for and on behalf of the Trustee and the Debtor's Estate and not on behalf of any other person or entity.

6.      Attached hereto as Exhibit A is a detailed breakdown of services rendered to the Estate during the Fee Period that reflect time charges at the hourly rate of the respective attorneys and professional staff of Applicant (collectively the "Statement" or the "Fee Period").   The Statement reflects the date, the description of services on behalf of the Estate and the identity of the professional staff members performing such services.   The rates charged by the Applicant are the rates customarily charged on routine, non-complicated matters, without considering the size of the case and the degree of responsibility, difficulty, complexity and results achieved.

7.      The Bankruptcy Estate received gross receipts totaling Three Hundred Twenty-Three Thousand Four Hundred Fourteen 00/100 Dollars ($323,414.00) as a result of the Trustee's and Applicant's efforts.   The Statement reflects total time charges of Fee Period of Ninety-One Thousand Four Hundred Eight and 00/100 Dollars ($91,408.00) representing 219.30 hours of time expended, with a voluntary discretionary adjustment of its fees of $650.00, plus necessary out-of-pocket expenses in the amount of $692.02 for a total requested amount of Ninety-One Thousand Four Hundred Fifty and 00/02 Dollars ($91,450.02) by the Applicant in Exhibit A for the Fee Period. (Applicant also made a discretionary adjustment of unbilled time of $755 in addition to the

2

courtesy adjustment of an additional $650 to account for any overlap in time between the related estates described herein.

8.      Pursuant to Local Bankruptcy Rule 2016-1, Applicant has prepared this Application in accordance with the Compensation Guidelines for professionals in the United States Bankruptcy Court for the District of Maryland (the "Compensation Guidelines").

### Compensation Guidelines Analysis

9.      With respect to the Compensation Guidelines, Applicant submits the following standards have been complied with, or are being complied with, in this Application.

a)      The Statement attached hereto represents a detailed itemization of the services rendered, time expended, and expenses incurred in the course of providing professional services to the Trustee.  The Statement reflects total time charges for the Fee Period of Ninety-One Thousand Four Hundred Eight and 00/100 Dollars ($91,408.00) representing 219.30 hours of time expended, with a voluntary discretionary adjustment of its fees of $650.00, plus necessary out-of-pocket expenses in the amount of $692.02 for a total requested amount of Ninety-One Thousand Four Hundred Fifty and 00/02 Dollars ($91,450.02) by the Applicant in Exhibit A for the Fee Period. Applicant believes that the services rendered were necessary and beneficial to the estate.  Applicant also made a discretionary adjustment of unbilled time of $755 in addition to the a courtesy adjustment of $650 to account for any overlap in time between the related estate described herein.

b)      Applicant hereby confirms it has reviewed the time and expenses for which compensation is sought in this Application and believes such compensation to be reasonable.

10.     The Compensation Guidelines require categorizing the major tasks performed in the course of representing the Trustee.  The following is a detailed summary description of services

rendered, organized by task, and the summary of the time expended for each timekeeper working on such task.  The attached Statement contains a listing of daily time entries that have been edited to reflect the corresponding task numbers provided below.

**Task 001**
**General Administration and Fact Investigation**

11.     This was a complicated case due to the inaccurate information in the Debtor's schedules, the inaccurate testimony of the Debtor's principal and the actions of the Debtor, the Debtor's principal and his related entity, CJ Cahill Design Build, Inc. ("Design Build").  All three (3) of the foregoing were simultaneously in separate bankruptcy proceedings.  It appeared that the Debtor and Design Build used some of the same employees and the same vendors and the Debtor's principal was unclear which entity paid for various expenses, owned various assets or otherwise could distinguish between the entities.

12.     As more fully described below, the majority of time within this Task 001 involved preparing for and attending the three (3) lengthy meetings of creditors, investigating, analyzing and assembling facts and documentation related to the Debtor's business and financial affairs. This investigation and analysis included requests for and analyzing a large volume of financial, tax, motor vehicle titles and related business records of the Debtor, as well as communications with the Trustee, Debtor's Counsel and creditors' counsel.

13.     Prior to the filing of this case, the Debtor was a corporation licensed to do business in the State of Maryland, the District of Columbia and the Commonwealth of Virginia and organized, owned, operated  by Christopher John Cahill ("Christopher").

14.     Prior to the filing of this case, Christopher also owned and operated Design Build which was also a corporation organized by Christopher and licensed to do business in the State of Maryland, the District of Columbia and the Commonwealth of Virginia.

15.     Both Design Build and the Debtor were in the home remodeling and landscape design business.

16.     Christopher exercised control over Design Build and the Debtor such that some of their obligations and employees were commingled.

17.     On November 7, 2022, the same day as the Debtor, Design Build filed a Petition under Chapter 7 of the Bankruptcy Code in Case No. 22-16226 MCR. Laura J. Margulies is the duly appointed Chapter 7 Trustee of Design Build.

18.     On December 2, 2022, Christopher filed a Petition under Chapter 7 of the Bankruptcy Code in Case No. 22-16740 MCR. Laura J. Margulies is the duly appointed Chapter 7 Trustee of the Estate of Christopher.

19.     Applicant attended three (3) § 341 Meetings of the Debtor.

20.     Christopher testified at the § 341 Meetings on behalf of the Debtor.

21.     Prior to the first § 341 Meeting, Applicant reviewed the Debtor's Schedules and Statement of Financial Affairs.

22.     On December 13, 2023, Applicant prepared for and attended the first meeting of creditors which was nearly one and a half hours in length. However, the Trustee did not receive all the required, and requested documentation from the Debtor and the Trustee determined that more time was needed to question the principal of the Debtor, as well as allow sufficient time for creditors to question the Debtor. As such, the Trustee continued the meeting of creditors.

23.     At the § 341 Meeting, Christopher testified that he had claims of embezzlement and fraud against Patrick Ghazarian ("Ghazarian"), a previous employee of the Debtor and Design Build, who acted as an accountant and bookkeeper for both the Debtor and Design Build.

5

24.     Christopher claimed, among other actions, that Ghazarian signed Christopher's name to various checks from the Debtor's and Design Build's bank accounts without Christopher's authorization and embezzled funds of the Debtor and Design Build for his personal use.

25.     It was necessary for Applicant to investigate these allegations specific to Botanical in order to determine whether these were valid claims that the Estate could pursue and recover for the benefit of the Debtor's creditors. Part of this investigation included analyzing the relevant documentation.

26.     Ultimately, Applicant determined that the facts and evidence surrounding these allegations against Ghazarian were limited and not worthwhile for the Estate to pursue. Applicant notes that very limited time was expended in researching these allegations as Ghazarian appeared more credible than Christopher.

27.     Prior to the second meeting of creditors, Applicant communicated with Debtor's Counsel to request the Debtor that the produce additional documentation to the Trustee, including documents required pursuant to 11 U.S.C. § 521.

28.     On January 11, 2024, Applicant prepared for and attended a second meeting of creditors which was approximately one hour and forty minutes in length. However, the Trustee still did not receive all the required, and requested documentation from the Debtor and the Trustee determined that additional time was needed to question the principal of the Debtor, as well as allow sufficient time for creditors to question the Debtor. As such, the Trustee continued the meeting of creditors to March 15, 2023.

29.     Applicant performed an initial review of  the Debtor's Schedules, Statement of Financial Affairs, tax returns and the Schedules and Statement of Financial Affairs of Design Build, which showed various transactions including assets belonging to the Debtor, Design Build

and Christopher, personally, that were sold to employees and subcontractors, loans from Christopher to the Debtor and Design Build, potential preferential transfers and various other questionable financial transactions.

30.     During the course of the investigation of the Debtor's business affairs, Applicant learned that Christopher loaned a significant amount of money to the Debtor and Design Build prior to the filing of these bankruptcy cases. As a result, Applicant determined that the Debtor's Estate may hold a claim against Christopher's Estate for avoidable transfers under 11 U.S.C. §§547 and 548.

31.     Applicant prepared a Proof of Claim on behalf of the Debtor and filed it in Christopher's Bankruptcy Case in the amount of $320,000.

32.     After the second meeting of creditors on January 11, 2023, the Trustee and Applicant did not receive all the requested documents from the Debtor prior to the § 341 Meeting, including the Debtor's bank statements as well as additional requested documentation regarding the Debtor's business affairs.

33.     In order to complete its due diligence and proper investigation into the Debtor's business financial affairs, Applicant drafted and served a Subpoena to Sandy Spring Bank merely to acquire complete bank records of the Debtor.  Christopher, the Principal of the Debtor, at times could not produce complete records and the Trustee had concerns whether Christopher would produce complete and accurate records on behalf of the Debtor.

34.     Creditors Scott and Shannon Forchheimer ("Forchheimer") communicated with Applicant regarding their intent to file a Motion for Relief from Stay with respect to their rights to recover from the Guaranty Fund maintained by the State of Maryland's Home Improvement Commission and to obtain the Trustee's consent to the relief from stay.

35.     Applicant communicated with Counsel for Forchheimer and the Trustee regarding the Trustee's consent to the relief from stay, which was ultimately filed on February 23, 2023 and Applicant review said Motion for Relief from Stay.

36.     Robert LaBelle and Michelle LaBelle (the "LaBelles"), creditors and former customers of the Debtor and Design Build, filed a Complaint Objecting to the Granting of a Discharge of Christopher in Adv. Proc Case No. 23-00098.

37.     Applicant and Counsel for the LaBelles shared related documentation and conducted correspondence regarding the LaBelles' claims against the Debtor as well as issues and facts related to the Debtor's avoidance actions.

38.     Upon receiving bank records from Sandy Spring Bank and the Debtor, Applicant began reviewing the records, including nearly two (2) years of bank statements for multiple accounts, hundreds of copies of canceled checks and numerous credit card statements. Said records were voluminous totaling thousands of pages and contained numerous potentially fraudulent transfers and preference payments to former employees, subcontractors, vendors as well as to Christopher and Richard Cahill ("Richard"), Christopher's spouse.

39.     In order to digest the aforementioned transfers and pertinent data, Applicant created a spreadsheet of notable transfers to include detailed information for use in preparing adversary proceedings.

40.     Applicant reviewed and notated transfers within the prior ninety (90) days and within the last two (2) years of filing as well as three (3) years of filing for purposes of state law avoidance actions.

41.     Applicant also reviewed records of Design Build which contained transfers recoverable by the Debtor to compare to the Debtor's records.

8

42.     On March 15, 2023, Applicant prepared for and attended the third 341 Meeting of Creditors, which was one hour in length.

43.     During these three (3) § 341 Meetings, in which the Trustee, Applicant, the U.S. Trustee's Office and other creditors questioned Christopher, on behalf of the Debtor, Christopher gave conflicting or contradictory answers to many questions, failed to provide clear and concise answers, and claimed he failed to recall important facts and information even though the events in question occurred just prior to the filing of the cases.

44.     Upon receiving and reviewing the requested documents from the Debtor and Sandy Spring Bank, which were extremely voluminous, Applicant learned that the Debtor, through Christopher, created a complex and confusing business operation whereby funds from customers of the Debtor and Design Build, as well as payments to the vendors, subcontractors and employees of the Debtor and Design Build were at times commingled amongst the bank accounts for the Debtor and Design Build, as well as the Christopher's personal bank accounts.

45.     The Debtor, through Christopher, also commingled some assets of the Debtor and Design Build as well as Christopher's personal assets.

46.     Christopher caused a lender to advance funds to Christopher by transferring the assets to Design Build, and Christopher then immediately took the funds. Similarly, when repaying the creditor, Christopher took personal funds, transferred them to Design Build and then Design Build transferred funds to a designee of the lender and not to the lender. Applicant reviewed the Debtor's records for any similar or unusual transfers running through the Debtor's account for Christopher or Design Build.

47.     Applicant learned that the books and records for the Debtor were poorly maintained.

48.     Due to the length of the three (3) 341 Meetings, the volume of information and facts discussed, and Christopher's confusing testimony, Applicant had to order and review the transcripts of the 341 Meetings for review, comparison and analysis. The transcripts aided Applicant in its review of Christopher's testimony, and ability to cross-reference Christopher's testimony with the facts from the Debtor's bank records, tax returns and other documentation which evidenced preference payments, fraudulent pre and post-petition transfers and an intent to hinder and delay the administration of the Estates.

49.     After reviewing and analyzing the Debtor's financial and related business records, documentation of the Debtor's assets, Applicant determined that there were several causes of action against various subcontractors of the Debtor as well as against Christopher and his spouse, Richard Cahill.

50.     Also involved in the administration were motor vehicles.  The Debtor owned numerous vehicles and landscape equipment, many of which were either sold to employees or subcontractors, or were traded in exchange for debt owed by the Debtor and Design Build.

51.     Christopher provided inaccurate information as to whether the Debtor or Design Build owned various vehicles that had been transferred.

52.     Due to the conflicting testimony of Christopher as well as incomplete records produced by Christopher, Applicant prepared a subpoena to the Maryland Motor Vehicle Administration ("MVA") for a complete record of all vehicles titled to the Debtor.

53.     Applicant communicated with the Trustee regarding the release of the Debtor's bank records and title to vehicles.

54.     Applicant also communicated with Debtor's counsel regarding the turnover of relevant documentation, potential problems with the Debtor's case, understanding Christopher's testimony on behalf of the Debtor and rescheduling the meeting of creditors.

55.     The lack of cooperation by Christopher, his failure to turn over complete and accurate records, as well as his conflicting testimony at each of the three (3) 341 Meetings caused an unnecessary increase in fees and a significant delay in the administration of the Estate, at the expense of his creditors.

56.     The time spent by Applicant performing this task is summarized as follows:

| Timekeeper | Rate | Hours | Amount Billed |
|---|---|---|---|
| James M. Hoffman – Attorney | $485.00 | 12.80 | $ 6,208.00 |
| James M. Hoffman – Attorney | $535.00 | 17.80 | $ 9,523.00 |
| Miriam Margulies – Paralegal | $125.00 | 9.80 | $ 1,225.00 |
| Miriam Margulies – Paralegal | $200.00 | 3.70 | $ 740.00 |
| **Total Task 001** | | **44.10** | **$17,696.00** |

**Task 002**
**Master Complaint for Avoidable Transfers and Hearing Attendance**

57.     Applicant created an outline of the various causes of actions against third parties for the Debtor as well as the same claim that Design Build may have against the third-parties to determine in which cases the Debtor and Design Build would be co-plaintiffs.

58.     Applicant created a template complaint to use for each of the six (6) adversary proceedings to be efficient and save the Estate expense.

59.     In preparation of the template complaint, Applicant reviewed and analyzed records of the Debtor, including extensive financial and vehicle records and reviewed the numerous lengthy transcripts of the meetings of creditors. Applicant also reviewed the transcripts to reference testimony from Christopher, which often conflicted with the Debtor's financial and business records.

60.     Applicant prepared a preliminary complaint against Jairus Construction, a former subcontractor employed by the Debtor. However, after further research, Applicant determined that claims against Jairus Construction were not worthwhile for the Estate to pursue due to the likely value of the assets in issue. Time expended on this complaint was minimal although Applicant had a fiduciary duty to investigate all potential claims of the Estate.

61.     Applicant filed four (4) adversary proceedings in which the Debtor was either sole or co-Plaintiff with Design Build and Applicant filed one adversary proceeding exclusively in the name of Design Build.

62.     In order to efficiently manage each of the five (5) initial adversary proceedings and limit costs to the Estate, Applicant filed each of these adversary proceedings on the same date so that the initial hearing dates and deadlines fell on the same dates.

63.     After the five (5) adversary proceedings were filed, Applicant attended the pretrial hearings for each one.

64.     Applicant communicated with the Trustee regarding the status of various progressions throughout the case.

65.     The time spent by Applicant performing this task is summarized as follows:

| Timekeeper | Rate | Hours | Amount Billed |
|---|---|---|---|
| James M. Hoffman – Attorney | $535.00 | 12.90 | $6,901.50 |
| James M. Hoffman – Attorney | $590.00 | 0.70 | $   413.00 |
| **Total Task 002** | | **13.60** | **$7,314.50** |

### Task 003
### Complaint Against Christopher Cahill and Richard Cahill

66.     In coordination with the Trustee, Applicant prepared and filed in Christopher's case multiple Objections to Christopher's Claim of Exemptions and Amended Claim of Exemptions ("Exemption Objections") relating to a $44,000 tax refund as well as additional personal property

that the Trustee claimed exceeded the applicable exemptions and/or was not subject to an exemption as tenancy by the entireties due to the Debtor's, Design Build's and Christopher's individual case's joint claims against Christopher and Richard.

67.     The Trustee alleged that the Debtor's Bankruptcy Estate and Design Build's Bankruptcy Estate (the Debtor and Design Build are herein after collectively referred to as the "Debtor Entities") were entitled to avoid transfers ("Cahill Transfers") made to or for the benefit of Christopher and Richard during the three (3) year period prior to the Petition Date including, without limitation, avoidable  transfers  set forth on Exhibits A, B and C attached to the Cahill Complaint, as more fully described in the following paragraphs.

68.     Applicant engaged in extensive negotiations with Counsel for the Debtor and Christopher in attempt to resolve the Trustee's claims amicably without further litigation.

69.     On November 22, 2023, the Trustee, on behalf of the Debtor Entities, filed a Complaint in Adversary Proceeding Case Number 23-00287 against Christopher and Richard alleging various causes of action (the "Cahill Complaint").

70.     The Cahill Complaint alleged that, at the time of the Cahill Transfers, the Debtor Entities made payments on antecedent debts to Christopher and/or Richard during the applicable preference period on account of credit and/or loans provided by Christopher and/or Richard.

71.     The Cahill Complaint alleged that Christopher, as an officer of the Debtor Entities, commingled the assets and obligations of the Debtor Entities.

72.     The Cahill Complaint alleged that Christopher distributed assets of both Debtor Entities to former employees, vendors, subcontractors, and to himself and Richard without reasonably equivalent value or to hinder, delay or defraud other creditors, including customers, from receiving a distribution in bankruptcy.

73.     The Cahill Complaint alleged that Christopher and Richard received avoidable Transfers from the Debtor Entities that were deposited into accounts owned as tenancy by the entirety.

74.     The Cahill Complaint alleged that many Cahill Transfers were not accurately disclosed in Christopher's Schedules and Statement of Financial Affairs nor were they accurately disclosed in Christopher's testimony at meetings of creditors in his individual case or the cases of the Debtor Entities.

75.     The causes of action in the Cahill Complaint would have been difficult and expensive to prove due to conflicting Schedules and statements of Cahill, but the Complaint provided significant value to cause Cahill's Estate to resolve all issues including the objections to exemptions.

76.     The Parties were unable to resolve their disputes and agreed to engage the services of a third-party mediator.

77.     Applicant prepared a mediation statement which was fifteen (15) pages in length, included eighty (80) pages of exhibits and Applicant also engaged in correspondence with the mediator, the Trustee and Counsel for the Debtor, and Counsel for Christopher.

78.     In preparation for the mediation statement, Applicant prepared a draft of the Amended Complaint against Christopher and Richard which was included as an exhibit to the mediation statement.

79.     After extensive negotiations lasting months between the parties, and to avoid the significant costs of further investigation into the facts in this case, the costs of litigation and the risk of loss, the Parties agreed to a settlement agreement (the "Settlement Agreement") to settle

the claims regarding the Cahill Transfers between the Debtor Entities, on the one hand, and Christopher and Richard, on the other hand.

80.     Under the Settlement Agreement, Christopher and Richard agreed to pay to Christopher's Estate the total sum of $75,500.00 ("Settlement Amount"). Additional terms in which Christopher and Richard agreed to pay the Settlement Amount are summarized below:

     A.     Within 5 business days of the date of the Settlement Agreement, Christopher was to file a proposed Consent Order wherein the Exemptions Objection is resolved by (i) all assets of Christopher being deemed fully exempt, except (ii) a portion of the Christopher's 401(k) retirement account, as scheduled at line 21 of Schedule A/B at docket entry 65 in his individual case, equal to Seventy Five Thousand Five Hundred Dollars and No Cents ($75,500.00), shall be deemed non-exempt (the "Non-Exempt 401(k) Portion"); and

     B.     At such a time as the Trustee deemed proper, but in no event more than six (6) months after entry of an order resolving the Exemptions Objection, the Trustee was to file a motion with this Court seeking turnover of the Non-Exempt 401(k) Portion from the custodian of the Christopher's retirement account (the "Turnover Motion"). Christopher was to execute a consent order acknowledging his acquiescence to – and support of – the Turnover Motion (the "Turnover Consent Order").

81.     On April 4, 2024, Applicant drafted and filed the Motion to Approve Compromise, which was filed in the Adv. Proc. 23-00287, as well as Christopher's individual case and the bankruptcy cases of the Debtor Entities.

82.     Applicant engaged in discussions with John Hancock Financial, the holder of Christopher's retirement funds to release the Settlement Amount.

83.     Although the Debtor Entities had claims against Christopher and Richard, the Cahill Complaint also included claims regarding Christopher's personal exemptions in his individual case.  Through negotiations, the parties agreed that the  Settlement Amount would be allocated to Christopher's Estate so that his creditors will share in a distribution of those funds.

84.     Applicant notes that the majority of time relating to the Trustee's objections to Christopher's claim of exemptions were charged to Christopher's Estate and the majority of time relating to the preparation of the complaint, amended complaint and avoidance actions on behalf of the Debtor, and preparation and attendance of the mediation were charged to the Debtor's Estate.

85.     Applicant also communicated with the mediator and the Trustee.

86.     The time spent by Applicant performing this task is summarized as follows:

| Timekeeper | Rate | Hours | Amount Billed |
|---|---|---|---|
| James M. Hoffman – Attorney | $535.00 | 32.00 | $17,120.00 |
| James M. Hoffman – Attorney | $590.00 | 13.80[1] | $ 8,142.00 |
| Miriam Margulies - Paralegal | $200.00 | 26.50 | $ 5,300.00 |
| **Total Task 004** | | **72.30** | **$30,562.00** |

**Task 004**
**Complaint Against William Rodas**

87.     At the 341 meeting of creditors, Christopher testified that William Rodas[2] ("Rodas") did work for both the Debtor and Design Build. However, Rodas is scheduled as a creditor only in the bankruptcy case of Design Build.

88.     After reviewing the Debtor and Design Build's financial records, Applicant discovered that on or about April 20, 2022, Design Build paid the sum of $12,000 to Rodas.

89.     On or about April 29, 2022, the Debtor paid Rodas the sum of $24,850 on behalf of Design Build.

90.     According to the Statement of Financial Affairs of Design Build, on October 17, 2022, Design Build had transferred to Rodas a 2012 Nissan Van (the "Nissan Van) to settle a $14,500 debt (the "Rodas Vehicle Transfer").

91.     On or about November 4, 2022, Botanical paid Rodas $7,500.

---

[1] This total does not include unbilled time of 1.30 hours equal to $695 in fees.
[2] On Design Build's Statement of Financial Affairs, Rodas' last name is spelled as both "Rhodus" and "Rodas." Upon further review, it appears the correct spelling is "Rodas."

92.     The aforementioned financial transfers are herein collectively referred to as the "Rodas Financial Transfers."

93.     At the Design Build meeting of creditors on March 15, 2023, Cahill testified that William Rodas "did work for both companies… The majority of the work that he did was for CJ Cahill Design Build." However, the Rodas Transfers reflect payments made by both the Debtor and Design Build, with a larger sum paid by the Debtor.

94.     Applicant prepared a complaint against Rodas ("Rodas Complaint") to Avoid and Recover Transfers under U.S.C. §§ 544, 547, 548 and 550, reviewed and assembled exhibits to the complaint, including adding numerous citations to the transcripts of the 341 meetings.

95.     On January 19, 2024, Applicant filed a complaint against Rodas in Adv. Proc. No. 24-00016.

96.     Rodas failed to timely respond to the Rodas Complaint and Applicant prepared the Motion for Default Judgment.

97.     Immediately before Applicant intended to file the Motion for Default Judgment, Counsel for Rodas contacted Applicant regarding her recent retention as counsel and asserted defenses to the Rodas Complaint.

98.     Applicant and Counsel for Rodas then entered into settlement negotiations.

99.     Rodas asserted that the Nissan Van transferred was worth less than the amount at the time the Rodas Vehicle Transfer occurred due to the mileage and damage to the vehicle.

100.    Rodas also asserted defenses that the Financial Transfers were in the ordinary course and he provided New Value.

101.    After prolonged and extensive discussions and delayed responses from counsel, it appeared that the Parties would be unable to settle their claims and Applicant prepared for trial.

102.    Shortly thereafter, to avoid the significant costs of further investigation into the facts in this case, the costs of litigation and the risk of loss, the Parties agreed to settle the claims regarding the Rodas Vehicle Transfer and Financial Transfers from Botanical and Design Build to Rodas through a sale of the vehicle in issue.  The Trustee then learned that the vehicle in issue was worth a lot less than led to believe in the Statement of Financial Affairs.

103.    Applicant prepared a Motion to Approve Compromise and Consent Order and communicated with counsel regarding same.

104.    Under the settlement agreement, Rodas agreed to pay the Estate the total sum of $15,000.

105.    As demonstrated from Applicant's time entries, Applicant made full faith efforts to expedite the settlement negotiations and encourage timely communication with counsel for Rodas.

106.    The time spent by Applicant performing this task is summarized as follows:

| Timekeeper | Rate | Hours | Amount Billed |
|---|---|---|---|
| James M. Hoffman – Attorney | $535.00 | 2.10 | $1,123.50 |
| James M. Hoffman – Attorney | $590.00 | 9.60 | $5,664.50 |
| Miriam Margulies – Paralegal | $200.00 | 8.00 | $1,600.00 |
| **Total Task 004** | | **19.70** | **$8,387.00** |

## Task 005
## Complaint against Sunset Pool Contractors, LLC

107.    Sunset Pool Contractors, LLC and Sunset Group, LLC ("Sunset") were a former subcontractors hired to perform work for the Debtor.

108.    Applicant's review of the Debtor's bank statements revealed that some check payments from the Debtor to Sunset were made payable to Sunset Pools Contractors, LLC and some payments were made payable to Sunset Group. From Applicant's research, it appears that the Christopher and/or his bookkeeper were using the names Sunset Group and Sunset Pool Contractors interchangeably. Applicant's research has determined that although they appear to be

18

separate entities, they are managed by the same individuals and perform the same work. As such, Applicant named both Sunset entities as defendants in the complaint as described below.

109. In the course of investigating the pre-petition transactions of the Debtor, the Trustee determined that the Debtor had transferred to Sunset a tractor and various other related landscape equipment ("Equipment") during the ninety (90) days prior to the Petition Date.

110. In consideration for these transfers, Sunset forgave $100,538.61 of debt owed to the Debtor and/or Design Build. However, at the 341 Meeting of Creditors held on December 13, 2022, the Debtor, through Cahill, testified that the Debtor owed Sunset $110,000 before the transfer.

111. Also, during the Preference Period, the Debtor paid Sunset the sum of $24,850 (said payment and the above-mentioned equipment transfers are collectively referred to as the "Sunset Transfers").

112. Applicant prepared a complaint against Sunset to Avoid and Recover Transfers under U.S.C. §§ 544, 547, 548 and 550, reviewed and assembled exhibits to the complaint, including adding numerous citations to the transcripts of the 341 meetings.

113. On January 19, 2024, the Trustee filed a Complaint against Sunset in Adv. Proc. No. 24-00017 ("Sunset Complaint").

114. Sunset failed to timely respond to the Sunset Complaint and Applicant prepared a Motion for Default Judgment.

115. Immediately before Applicant filed the Motion for Default Judgment, Counsel for Sunset contacted Applicant regarding his recent retention as counsel and asserted defenses to the claims in the Sunset Complaint.

116.    Sunset asserted that the Debtor, through its principal, Christopher, misled Sunset about the condition of the Equipment, that some of the equipment was not operable, and that the condition and value of said Equipment were much less than anticipated at the time the Sunset Transfers occurred as evidenced by expensive repairs.

117.    Applicant expended time in reviewing and analyzing Sunset's defenses and the Sunset's equipment values and repairs.   Sunset provided actual repair bills.

118.    Sunset also raised several other defenses as summarized in the Motion to Approve Compromise filed in the Sunset Complaint. DE 11.

119.    The Parties then entered into lengthy settlement negotiations.

120.    After negotiations, and to avoid the significant costs of further investigation into the facts in this case, the costs of litigation and the risk of loss, the Parties agreed to settle the claims regarding the Sunset Transfers.

121.    Under the Settlement Agreement, Sunset paid the Trustee the total sum $39,000.00 in one lump sum.

122.    Applicant prepared a Motion to Approve Compromise with Sunset, a Consent Order, engaged in correspondence with Counsel for Sunset and correspondence with the Trustee.

123.    The time spent by Applicant performing this task is summarized as follows:

| Timekeeper | Rate | Hours | Amount Billed |
|---|---|---|---|
| James M. Hoffman – Attorney | $535.00 | 1.10 | $  588.50 |
| James M. Hoffman – Attorney | $590.00 | 9.90 | $5,841.00 |
| Miriam Margulies – Paralegal | $200.00 | 6.90 | $1,380.00 |
| **Total Task 005** | | **17.90** | **$7,809.00** |

### Task 006
### Complaint against B&C Diesel, LLC

124.    In the course of investigating the pre-petition transactions of the Debtor, the Trustee and Applicant determined that the Debtor had transferred to B&C Diesel, LLC ("B&C Diesel")

three (3) vehicles during the ninety (90) days prior to the Petition Date: a 2005 Ford F-550, another 2005 F-550 and a 2011 Ford F-650

125.    According to the Debtor's Statement of Financial Affairs and Christopher's testimony at the Debtor's 341 Meeting on December 13, 2022, the Debtor, through Christopher, transferred the first 2005 Ford F-550 ("First 2005 F-550") in exchange for the satisfaction of $16,857 of debt owed to B&C Diesel by the Debtor. According to Christopher's testimony, the value of First 2005 F-550 was $12,000, "… they were owed $16,857.56."

126.    According to the Debtor's Statement of Financial Affairs and Christopher's testimony, the Debtor, through Christopher, sold another 2005 Ford F-550 and a 2011 Ford F-650. Christopher testified he sold one of the Debtor's trucks for $10,000 and another for $15,000.

127.    The transfers of the above-mentioned vehicles are hereinafter referred to as the "B&C Diesel Transfers."

128.    Applicant prepared a Complaint against B&C Diesel, reviewed vehicle records and the transcripts of the 341 meetings.

129.    On January 19, 2024, the Trustee filed a Complaint in Adv. Proc. 24-00015 against B&C Diesel to Avoid and Recover Transfers under U.S.C. §§ 544, 547, 548 and 550 (the "B&C Diesel Complaint").

130.    B&C Diesel failed to timely respond to the B&C Diesel Complaint and Applicant prepared a Motion for Default Judgment.

131.    Shortly before Applicant filed a Motion for Default Judgment, Counsel for B&C Diesel contacted Applicant regarding his recent retention as counsel and asserted defenses to the claims in the B&C Diesel Complaint.

132.    On February 23, 2024, B&C Diesel filed an Answer to the B&C Diesel Complaint.

133.    The Defendant asserted that the vehicles transferred were worth less than the amount at the time the transfers occurred due to substantial repairs that had to be made to the vehicles and that two (2) of the three (3) vehicles were sold to individual owners of B&C Diesel. B&C Diesel alleged that the individuals lost substantial amounts of money after purchasing, repairing and then selling the two (2) vehicles.

134.    Applicant reviewed the bills of sale of the vehicles and confirmed that their value was significantly less than the value the Debtor's Statement of Financial Affairs led the Trustee to believe.

135.    After negotiations, and to avoid the significant costs of further investigation into the facts in this case, the costs of litigation and the risk of loss, the Parties agreed to settle the claims regarding the B&C Diesel Transfers from the Debtor to B&C Diesel.

136.    Under the Settlement Agreement B&C Diesel paid the Trustee the total sum $10,000.00 in one lump sum.

137.    Applicant prepared a Motion to Approve Compromise with B&C Diesel, a Consent Order, engaged in correspondence with Counsel for B&C Diesel and correspondence with the Trustee

138.    The time spent by Applicant performing this task is summarized as follows:

| Timekeeper | Rate | Hours | Amount Billed |
|---|---|---|---|
| James M. Hoffman – Attorney | $535.00 | 1.50 | $  802.50 |
| James M. Hoffman – Attorney | $590.00 | 3.10 | $1,829.00 |
| Miriam Margulies – Paralegal | $200.00 | 4.10 | $  820.00 |
| **Total Task 006** | | **8.70** | **$3,451.00** |

## Task 007
## Complaint against Hernandez & Gonzalez Flooring

139.    Luis Miguel Hernandez Henriquez, trading as Hernandez & Gonzalez Floors ("Hernandez"), was a former subcontractor of the Debtor.

22

140.    Within ninety (90) days prior the filing of this case, the Debtor made a transfer of an interest of the Debtor in property to or for the benefit of the Hernandez totaling $8,000.00 ("Hernandez Transfer").

141.    The Hernandez Transfer was made by Design Build in satisfaction of an antecedent debt or debts owed by the Debtor to Hernandez before the Hernandez Transfer was made.

142.    While the testimony of Christopher was inconsistent, on March 15, 2023, he testified that Hernandez was not an employee and was paid by check, but he did not recall by which entity.

143.    Applicant prepared a Complaint against Hernandez, reviewed the Debtor's financial records and records of Design Build, and the transcripts of the 341 meetings.

144.    On January 19, 2024, the Trustee filed a Complaint in in Adv. Proc. 24-00019 against Hernandez to Avoid and Recover Transfers under U.S.C. §§ 544, 547, 548 and 550 (the "Hernandez Complaint").

145.    After Hernandez failed to timely respond to the Hernandez Complaint, Applicant prepared a Motion for Judgment by Default.

146.    Due to the incomplete, inaccurate records of the Debtor which included old and/or incorrect mailing addresses of Hernandez, Applicant conducted research in attempts to locate Hernandez.

147.    On February 27, 2025, Applicant filed the Motion for by Default against Hernandez.

148.    On March 25, 2024, the Court entered the Order Granting Motion for Judgment by Default in the amount of $8,000 against Hernandez.

149.    Applicant notes that time billed on this matter is minimal, yet Applicant had a fiduciary responsibility to the Trustee to pursue and attempt to recover all assets of the Estate.

150.    The time spent by Applicant performing this task is summarized as follows:

| Timekeeper | Rate | Hours | Amount Billed |
|---|---|---|---|
| James M. Hoffman – Attorney | $535.00 | 1.50 | $   802.50 |
| James M. Hoffman – Attorney | $590.00 | 0.70 | $   413.00 |
| Miriam Margulies – Paralegal | $200.00 | 5.70 | $1,140.00 |
| **Total Task 007** | | **7.60** | **$2,195.00** |

## Task 008
## Pension Plan Issues and Claims of the Department of Labor

151.    The Department of Labor ("DOL"), on behalf of CJC And Assoc., Inc. T/A Botanical 401(k) Plan ("401K Plan"), filed two late proofs of claims in Christopher's case and one late filed claim, No. 46, in the Debtor's case.

152.    There was confusion by the DOL over the role of the Trustee with respect to the 401K Plan.

153.    The DOL concluded that the Trustee had a statutory duty to undertake the administration and closing of the 401K Plan pursuant to 11 U.S.C. 704(a)(11) as a responsibility of the Debtor.

154.    Resolution of these issues took multiple Zoom calls, written communications and research to demonstrate to the DOL that the Trustee had no authority to act for the 401K Plan.

155.    Christopher had not turned over to the Trustee any documents relating to the 401K Plan.

156.    The Trustee reviewed the documentation from the DOL and discovered that the 401K Plan predated the Debtor's existence.

157.    The EIN for CJC & Associates, Inc., which claimed to have been trading as Botanical (and was identified as the Plan administrator) is: XX-XXXX143.  The EIN for Botanical is XX-XXXX831.

158.    The 401K Plan is entitled the "CJC & ASSOCIATES, INC. T/A BOTANICAL DECORATORS 401(K) RATE GROUP PROFIT SHARING PLAN AND TRUST" ("Plan").  It was created effective January 1, 2000.

159.    The Plan Sponsor and Plan Administrator are identified as  CJC & Associates, Inc. t/a Botanical Decorators, 5011-B Olney-Laytonsville Road, Olney, MD 20832.

160.    The Trustee researched the State Department records and learned that "CJC & Associates, Inc." was organized in 1998 and lost its charter in October of 2023.  CJC & Associates, Inc. was in existence for 25 years and was employer and administrator for almost 25 years.

161.    Christopher testified that CJC & Associates, Inc. was not operational and had no assets.  His schedules in his individual bankruptcy case confirmed that CJC & Associates, Inc. was a different entity from the Debtor.

162.    Applicant and the Trustee explained to the Department of Labor that the Trustee had no statutory duty to administer the 401k Plan since:

A.      The Plan identified "Botanical Decorators" as a trade name for CJC & Associates, Inc. Any business can do business under a trade name, but that is not the legal name of the entity doing business.

B.      Eleven (11) years after the 401K Plan was effective, Christopher organized Botanical Decorators, Inc. – in December of 2011.  It is a separate entity from CJC & Associates, Inc. under Maryland law.

     C.     CJC & Associates, Inc. could do business under a trade name of an organized entity, although that is confusing.

     D.     The creation of the Debtor did not cause a merger with CJC & Associates, Inc. They are separate entities particularly since they each maintained their separate corporate status for 13 years after the creation of Botanical Decorators, Inc.

163.     The DOL ultimately agreed after much time and expense that the Trustee was not obligated to administer the 401K Plan, saving the Debtor's Estate significant time, costs of administration and delay in the closing this Estate.

164.     The DOL filed four (4) claims against the Debtor and the Estate of Christopher Cahill. Two of the claims filed in Christopher's case were not timely and one filed in the Debtor's case was not timely.

165.     The DOL filed some claims as a priority, but documentation did not support priority treatment. After communications with Applicant, the DOL provided such information in subsequent communications.

166.     A priority claim for a pension is based on the earnings within 180 days of the filing of the case. The amount of $17,461 was identified as a proper priority claim and the amount of $9,547 was identified as a general unsecured claim in both cases.

167.     The Trustee subsequently learned that one of the claims related to claims against Design Build, but such claim was not filed and was added to claims in Botanical's and Christopher's Estates.

168.     With respect to the late claims, on September 6, 2024, nearly one and a half years after the claims bar date expired, the DOL, on behalf of the 401K Plan, filed Claim No. 29 in

Christopher's Estate for a total amount of $26,881.28, $17,461.08 of which the DOL stated was entitled to a priority claim under 11 U.S.C. § 507(a)(5).

169.    On September 6, 2024, the DOL, on behalf of Claimant, filed a second, but general unsecured Claim No. 30, against Christopher's Estate for the total amount of $11,041.44.

170.    The DOL timely filed a duplicate claim of Claim No. 29 against the Debtor as Claim No. 26 and a second, but untimely duplicate claim, of Claim No. 30, against the Debtor as Claim No. 46.

171.    The Trustee, Applicant and the DOL conducted correspondence about the claims of the 401K Plan so the Trustee and Applicant could better understand why there are claims even being filed against Botanical and Christopher's Estate when Christopher was managing the Plan in issue and took loans against the 401K Plan.

172.    The DOL was very cooperative and addressed many of the Trustee's concerns including providing documentation to support priority claims.

173.    The Trustee stated that, in Christopher's case, the 401K Plan and DOL did not pursue the filing of the claims with the diligence required by the Bankruptcy Code and Rules and the claims in Christopher's case should be treated as subordinated to timely filed claims under 11 U.S.C. §726(a)(3).   These same claims, however, could be allowed in this case.

174.    Applicant attempted to avoid filing an Objection to the Claims of the DOL by working cooperatively with the DOL.

175.    After continued discussions and negotiations, the Trustee, Applicant and the DOL were able to resolve their disagreements and the DOL amended their claim in this case and the Trustee determined that it was not necessary to file the Objection to the late filed claims of the DOL in Christopher's proceeding.

27

176.    Because the above-referenced claims of the DOL also include the same claims filed in Christopher's case, Applicant charged its time in correspondence with the DOL to this proceeding so as not to duplicate time entries.

177.    The time spent by Applicant performing this task is summarized as follows:

| Timekeeper | Rate | Hours | Amount Billed |
|---|---|---|---|
| James M. Hoffman – Attorney | $590.00 | 4.10 | $2,419.00 |
| James M. Hoffman – Attorney | $650.00 | 4.60 | $2,990.00 |
| Miriam Margulies – Paralegal | $200.00 | 2.00 | $   400.00 |
| **Total Task 008** | | **10.70** | **$5,809.00** |

## **Task 009**
## **IRS Refund**

178.    The Trustee received notice from the Internal Revenue Service ("IRS") by mail dated January 2, 2023, that the Estate was entitled to a Federal tax refund from overpayment on Form 941 for the tax period ending March 31, 2021 in the amount of $131,248.02 ("Refund")

179.    The January 2, 2023 letter stated that the Refund will be issued "within 4-6 weeks…"

180.    On July 10, 2023, and being concerned over the delay in receiving the refund, and being concerned that Christopher intercepted the refund, the Trustee communicated with the IRS by telephone and was informed by a representative that a paper case was being created that day and her request for them to issue the check was "in queue."

181.    Approximately every three (3) months thereafter, the Trustee communicated with the IRS and each time was told that the request for the Refund was "in queue."

182.    On November 27, 2024, the Trustee called multiple offices within the IRS and the insolvency department. One agent informed the Trustee that she thought she could write the check but later determined that she could not. The agent informed the Trustee to give it "30 days" to receive the check. An agent with the insolvency unit provided the Trustee with the same response.

183.    On February 5, 2025, the Trustee again communicated with the IRS to inquire about the status of the Refund and was told by an agent named Mr. Allen that it was still "in queue" and he had no idea when the Refund would actually be issued.

184.    Upon the request of the Trustee, Applicant prepared a Motion to Compel Turnover of 2021 Federal Tax Refund and performed legal research regarding the processes of service upon the IRS and violations of the automatic stay by the IRS.

185.    On February 7, 2025, the Trustee filed a Motion to Compel Turnover of 2021 Federal Tax Refund (the "Turnover Motion"). DE 75.

186.    On February 14, 2025, the Trustee received a telephone call from a Ms. Jigars [phonetically spelled], who identified herself as an agent of the IRS. Ms. Jigars informed the Trustee that she was sending the Refund to the Trustee and wanted to verify the address of where to send it. After the Trustee provided Ms. Jigars with the correct payment address, Ms. Jigars informed the Trustee that she did in fact have the correct address and advised her that it was going out in that day's mail.

187.    On February 28, 2025, the Court entered the Order Granting Motion to Compel Turnover ("Turnover Order").

188.    As more fully set forth in the Turnover Order, the Court ordered the IRS to turn over the Refund within fourteen (14) days of the date of the Turnover Order (i.e., on or before March 14, 2025).

189.    On March 17, 2025, after the IRS should have delivered the refund check, an Assistant US Attorney assigned to handle this refund issue on behalf of the IRS, acknowledged to the Trustee that her client was aware of this Court's Turnover Order.

190.     On March 20, 2025, Counsel for the IRS provided an update that the Refund check was issued on March 17, 2025.

191.     However, as of close of business on March 24, 2025, the Trustee had not received a Refund check required by the Turnover Order.

192.     Upon the request of the Trustee, Applicant prepared a Motion to Show Cause Order Why the IRS Should Not Be Held in Contempt and for Sanctions for Violation of the Turn Over Order ("Show Cause Motion"). Applicant also performed additional legal research in preparation for the Show Cause Motion.

193.     On March 25, 2025, more than two (2) years after the date in which the IRS was to send the Trustee the Refund, Applicant filed the Show Cause Motion.

194.     Shortly thereafter, the Trustee received the Refund, with interest, and Applicant withdrew the Show Cause Motion.

195.     As a result of the Trustee's and Applicant's aggressive efforts, the Estate was able to recover the Refund of $151,030.71.

196.     The time spent by Applicant performing this task is summarized as follows:

| Timekeeper | Rate | Hours | Amount Billed |
|---|---|---|---|
| James M. Hoffman – Attorney | $650.00 | 5.90 | $3,835.00 |
| Miriam Margulies – Paralegal | $200.00 | 3.10 | $  620.00 |
| **Total Task 009** | | **9.00** | **$4,455.00** |

### Task 010
### Application for Compensation

197.     This Application for Compensation has been prepared in accordance with the Compensation Guidelines for Professionals in the United States Bankruptcy Court for the District of Maryland.  The Application for Compensation sets forth a detailed statement of: (1) the services rendered, (2) the time expended, (3) the expenses incurred, (4) the amounts requested, (5) the rates

charged for such services, (6) how the services rendered were necessary to the administration of, or beneficial at the time at which the services were rendered toward the completion of the case, (7) information relevant to a determination that the services were performed within a reasonable amount of time commensurate with the complexity, importance and nature of the problem, issue or task addressed, and (8) an affirmation that the compensation requested is reasonable based upon the customary compensation and reimbursement of expenses charged by the applicant and comparably skilled professionals in non-bankruptcy matters.  Additionally, in an effort to reduce costs to the Estate, Applicant utilized non-attorney staff, such as paralegals when applicable.

198.    Preparing this Application for Compensation was a monumental task, particularly due to reviewing and preparing the lengthy time entries encompassing over 200 hours of work over a two and a half (2 ½) year period, reviewing the complex history of this case and the related two cases, incorporating the facts and history which were intertwined with the other two cases, preparing a summary of five (5) separate adversary proceedings, and ten (10) total tasks.

199.    Applicant has extensively reviewed its time entries, in detail, to ensure there is no overlap or duplicate work billed to the Debtor's estate and the cases of Christopher and Design Build.

200.    In some instances, Applicant performed the same or similar work that may have involved assets belonging to one more debtors or potential or actual claims held by one or more debtors. In this respect, Applicant split its time between each Estate according to the amount of time expended on behalf of each Estate.

201.    The time spent by Applicant performing this task is summarized as follows:

| Timekeeper | Rate | Hours | Amount Billed |
|---|---|---|---|
| James M. Hoffman – Attorney | $590.00 | 0.70 | $   413.00 |
| James M. Hoffman – Attorney | $650.00 | 0.70 | $   455.00 |
| Miriam Margulies – Paralegal | $200.00 | 14.30 | $2,860.00 |
| **Total Task 010** | | **15.70** | **$3,728.00** |

| CUMULATIVE TIMEKEEPER HOURS AND AMOUNT BILLED | | |
|---|---|---|
| | **Hours** | **Amount Billed** |
| **Total Task 001** | **44.10** | **$17,696.00** |
| **Total Task 002** | **13.60** | **$  7,314.50** |
| **Total Task 003** | **72.30** | **$30,562.00** |
| **Total Task 004** | **19.70** | **$  8,387.50** |
| **Total Task 005** | **17.90** | **$  7,809.50** |
| **Total Task 006** | **8.70** | **$  3,451.50** |
| **Total Task 007** | **7.60** | **$  2,195.00** |
| **Total Task 008** | **10.70** | **$  5,809.00** |
| **Total Task 009** | **9.00** | **$  4,455.00** |
| **Total Task 010** | **15.70** | **$  3,728.00** |
| **TOTAL** | **219.30[3]** | **$91,408.00** |

## Lodestar Analysis

Under the lodestar analysis of twelve (12) factors enumerated in **Johnson v. Georgia Highway Express, Inc.**, 488 F.2d 714 (5th Cir. 1974) and adopted by the Fourth Circuit in **Barber v. Kimbrells, Inc.**, 577 F.2d 216 (4th Cir. 1978) and **Harman v. Levin**, 772 F.2d 1150 (4th Cir. 1985), Applicant submits the following analysis:

(a)    **Time and Labor Expended**.  Applicant's detailed Statement of services is attached as Exhibit "A."  Applicant has conscientiously reviewed the Statement for duplicative or unnecessary entries and has previously removed or adjusted any such entries.

(b)    **Skill Required to Properly Perform Legal Services Rendered**.  Because of the nature of the issues discussed above, in order to adequately represent the Trustee during the

---

[3] This amount does not include unbilled time of 1.3 hours, equal to fees in the amount of $755.

course of these proceedings, an expertise in the area of bankruptcy law, and federal litigation was required.  Applicant believes that the skill was required in order to properly perform the legal services required by the Trustee and that they possess such skills. James M. Hoffman, has practiced bankruptcy law and commercial litigation for more than thirty years (30) years, has been involved in numerous complex Chapter 11 cases, has served as general counsel to a Chapter 11 Trustee and special counsel to a Chapter 11 Trustee, and regularly serves as general counsel and/or special counsel to Chapter 7 Trustees in this and other jurisdictions.

(c)    **Counsel's Opportunity Costs in Presenting the Instant Litigation**. Applicant believes the opportunity costs in representing the Trustee was a factor in this case as it will not be paid for all the services it rendered. This case was high risk due to the lack of cooperation by the Debtor's principal, significant communication delays, inaccurate and conflicting testimony by the Debtor's principal and a failure to turnover complete records and documentation as requested by the Trustee. This hampered the Trustee's ability to timely administer the Estate, which unnecessarily increased fees and costs, at the expense of the Debtor's creditors.

(d)    **Customary Fees for Like Work**.   The customary fees charged in these matters are normally measured by the time expended and the results obtained.  In representing the Trustee, Applicant charged its usual and customary rate for all similar bankruptcy and non-bankruptcy cases.

(e)    **Applicant's Expectation at the Outset of Litigation**.  As in all litigation, there is no guarantee as to the outcome.

(f)    **Time Limitations**. The issues presented in this case did not impose significant time limitations upon Applicant.

33

(g)    **Amount in Controversy and Result Obtained**.  The Applicant was engaged as Special Counsel to the Trustee to investigate the Debtor's business operations, undisclosed assets, and fraudulent conveyances, preference payments including pre and post-petition payments and liquidation of the Estate's assets.  Applicant's efforts resulted in the Estate collecting gross receipts totaling Three Hundred Twenty-Three Thousand Four Hundred Fourteen 00/100 Dollars ($323,414.00) from the Settlement Agreements with William Rodas, Sunset Pool Contractors, LLC, B&C Diesel, LLC and the tax refund from the IRS. The Trustee also collected funds from the IRS relating to and tax refund from 2020, proceeds from a bank sale of a truck, an insurance refund relating to a truck and a credit balance refund from a credit card belonging to the Debtor.

(h)    **Experience, Reputation and Ability of Counsel**.  Applicant submits it is well respected among the bench and bar of this Court and the courts of neighboring jurisdictions. Applicant submits that as a result of its experience in bankruptcy matters, Applicant performed legal services required in representing the Trustee with a high degree of confidence and within an economy of time as compared to the amount of time which would have been required by a lesser experienced Applicant.

(i)    **Undesirability of Case**.  Applicant believes that the representation herein was undesirable for a number of reasons set forth above as the Debtor's principal engaged in profound dilatory tactics by removing assets of the Estate prior to and after the filing of this case and the bankruptcy cases of the Debtor Entities, failing to disclose to the Trustee and the Court about such removal of assets, failing to provide information and documentation about such assets, failing to provide the Trustee with the requested and required documentation prior to and after the 341 Meetings, failing to provide complete and accurate responses at each of the Debtor's 341

Meetings, and failing to timely provide responses to the Trustee and Applicant throughout the entire administration of the Estate, among other actions and omissions. This caused an unnecessary delay in the administration of the Estate at the expense of the Applicant and the other creditors of the Estate. These problems were balanced in part by working with the Chapter 7 Trustee who is knowledgeable, experienced and makes Applicant's representation more efficient through combining our efforts. Frequently, as in this case, it was initially not known whether there would be sufficient assets to pay the Applicant, which makes the case undesirable. This type of case is essentially a contingent fee case with no compensation associated with the high risk taken. Applicant provided a discretionary adjustment to the Estate which includes unbilled time of $755 plus a courtesy adjustment of an additional $650.

       (j)    **Professional Relationship with Client**. As stated in the Affidavit of Proposed Attorneys as part of its Retention Application, and as filed with the Court, Applicant has no relationship or connection with the Debtor, its creditors or any other parties in interest, or their respective attorneys in this bankruptcy proceeding or the Chapter 7 Trustee except as disclosed. The Applicant represented the Trustee in this case.

       (k)    **Fee Awards in Similar Cases**. Applicant believes that the compensation sought in this Application is reasonable and consistent with fees awarded in similar cases.

       (l)    **Conformity with Compensation Guidelines:** The undersigned hereby certifies that he is familiar with Local Rule 2016-1 and Appendix "D" thereto, the Compensation Guidelines for Professionals in the United States Bankruptcy Court for the District of Maryland (the "Compensation Guidelines"), and that to the best of his knowledge this Application for Allowance of Fees to Counsel for the Trustee, seeking fees, was submitted in conformity with the Local Rule and the Compensation Guidelines.

WHEREFORE, Applicant prays that it be awarded final compensation and costs as follows:

A.    That compensation be awarded to Offit Kurman, P.A. in the amount of Ninety-One Thousand Four Hundred Eight and 00/100 Dollars ($91,408.00), with a voluntary discretionary adjustment of its fees of $650.00 for total fees of $90,758.00, plus necessary out-of-pocket expenses in the amount of $692.02 for a total requested amount of Ninety-One Thousand Four Hundred Fifty and 00/02 Dollars ($91,450.02); and

B.    That this Court authorize the Trustee to immediately pay the sum of Ninety-One Thousand Four Hundred Fifty and 00/02 Dollars ($91,450.02); and

C.    And for such other and further relief as this Honorable Court may deem just and proper under the circumstances.

Date:  April 24, 2025                              Respectfully submitted,

 */s/ James M. Hoffman*
James M. Hoffman, Esquire, Bar No. 04914
Offit Kurman, P.A.
7501 Wisconsin Avenue, Suite 1000W
Bethesda, Maryland 20814
O (240) 507-1700
F (240) 507-1735
jhoffman@offitkurman.com
*Counsel for Laura J. Margulies, Chapter 7 Trustee*

4903-4980-5879, v. 6

36